Filed 12/12/22 P. v. Montanez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C094671 |
| Plaintiff and Respondent, | (Super. Ct. No. 06F00341) |
| v. | |
| JAVIER MONTANEZ, | |
| Defendant and Appellant. | |

Defendant Javier Montanez was charged with murder after he fatally stabbed Clinton Poole through the heart during a street fight. At trial, defendant claimed self-defense, but the jury found him guilty of second degree murder. The jury also found true that defendant used a deadly weapon (a knife) in the commission of the offense. Defendant was sentenced to an indeterminate term of 15 years to life.

On appeal, defendant argues the trial court erred by (1) failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter; and (2) issuing the pattern instruction for contrived self-defense. (CALCRIM No. 3472.) Relying on *People*

1

*v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant also argues that the trial court erred in imposing certain fines and fees without first holding a hearing to determine his ability to pay them. Finally, defendant argues that his counsel was ineffective in failing to make a record of mitigating youth-related evidence in anticipation of an eventual youthful offender parole hearing. We will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Following the well-established rule of appellate review, we recite the facts in the light most favorable to the judgment, drawing all reasonable inferences in support of the conviction. (*People v. Bogle* (1995) 41 Cal.App.4th 770, 775.) Additional information relevant to the claims raised on appeal is discussed below.

A.    *The prosecution*

On the night of January 6, 2006, teenage brothers C.G. and B.G. held a party at their home in Galt while their parents were out of town. Among the gathered friends were Jennifer D. and defendant.

As the party progressed, a second, uninvited group of people arrived, and an argument ensued over the type of music being played. The argument escalated into fighting, which then spilled out onto the street. Witnesses estimated there were 40 to 50 people involved and described the scene as being "like a riot."

The victim, Clinton Poole, lived across the street from C.G. and B.G. On the night of the party, Poole was home with his girlfriend, Judy, and his friend, Daniel. The three of them were socializing on Poole's front porch when the fighting started.

Defendant, standing on the sidewalk near Poole's home, saw Poole watching the fighting. Defendant said to Poole, "What the fuck are you looking at?" or something to that effect. Defendant appeared angry and his demeanor suggested he wanted to fight.

Poole told defendant that he was disrespecting the neighborhood and needed to leave. Defendant retorted that "it was his neighborhood and his town." Judy heard defendant threaten that houses were going to "get shot up" and that he was going to stab

2

Poole. Defendant and a group of other men then approached Poole, jumped him, and started beating him on his front lawn. At some point, someone yelled, "He's got a shank," and the attackers backed off. Poole got up and walked toward a dirt pile in front of his garage.

Shortly after Poole walked away, defendant chased after him. Jennifer testified that as defendant approached Poole, defendant was holding a knife in his hands. Judy did not recall seeing a knife in defendant's hands, but she told the police she heard defendant say he was going to stab Poole.

Defendant and Poole squared off in front of Poole's garage. By this time, both defendant and Poole were armed with knives. Jennifer jumped on defendant's back, causing him to momentarily drop his knife. Defendant then picked up the knife and stabbed Poole in the chest. Poole stumbled to his front door, went inside, and locked the door behind him.

When officers arrived at the scene, they found Poole unresponsive. There was a knife with a "gut hook" near him. Judy told officers that the knife belonged to Poole.

The autopsy of Poole revealed that he died from a single stab wound to his chest. The pathologist identified no other major physical injuries. The stab wound occurred on the left side of his chest, continued through his heart, passed the spine, and exited at the back of his chest cavity. The wound was between five and seven inches deep. The forensic pathologist who performed the autopsy testified that it would have taken a "significant amount of force" to inflict the stab wound. The pathologist also confirmed that the blade that caused the lethal wound had to have been at least five inches long, and that a spatula or putty knife with a one-inch blade could not have made the wound in Poole's chest.

After the incident, law enforcement officers searched for defendant for months without success. In September of 2018, nearly 12 years after Poole's death, officers located defendant in Mexico, extradited him, and arrested him for Poole's murder.

3

B.    *The defense*

Defendant, testifying on his own behalf, claimed that he killed Poole in self-defense. He claimed that he went outside to try break up a fight. As he did so, Poole's friend, Daniel, attacked him. Defendant testified that he punched Daniel. At about the same time, defendant felt "something that was pulling [his] skin" on his neck. He turned and saw Poole screaming at him with a knife in his hand.

As defendant backed away, he felt pain and saw blood on his hand where he had touched his neck. Defendant testified he felt dizzy and knew he needed to go to the hospital. He went to his car and opened the door but dropped his key. As he was searching for the key, defendant saw Daniel approaching with a knife. Defendant grabbed a "work tool"—which he described as a "pointy blade about an inch long"—and ran behind his car. Defendant saw two individuals coming towards him, one of whom was carrying a knife. As defendant turned to run, Poole stabbed him in the chest and cut his bicep. In response, defendant "jabbed [his] blade" into Poole. Thereafter, defendant received a ride to the hospital, where he received 182 stiches to treat extensive cuts to his back, shoulder, arm, and side.

Defendant denied that he did anything to irritate Poole, instigate a fight, or seek revenge. He denied ever being near the dirt pile in front of Poole's garage. He claimed that he stabbed Poole in self-defense, although he acknowledged that he never told police that he acted in self-defense.

Defendant admitted that he fled the country within approximately 12 hours of being released from the hospital. Defendant claimed to have fled because he was afraid for his life. Defendant testified that visitors at the hospital told him someone died and that he "better watch out . . . . They're going to try to kill you . . . ." Defendant's mother testified that a few days after the incident, gunshots were fired into the wall of their family residence.

4

C. *Jury instructions, conviction, and sentencing*

In an amended information, defendant was charged with a single count of murder (§ 187, subd. (a)—count one), and it was further alleged that he personally used a deadly and dangerous weapon (a knife) during the commission of the offense. (§ 12022, subd. (b)(1).)

The trial court instructed the jury on first and second degree murder (CALCRIM Nos. 520 and 521), voluntary manslaughter based on provocation or sudden quarrel and heat of passion (CALCRIM Nos. 522, 570), voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571), and self-defense. (CALCRIM Nos. 505, 3471, 3472, 3474.) Defendant did not request, and the trial court did not issue, an involuntary manslaughter instruction. (CALCRIM No. 580.)

The jury found defendant not guilty of first degree murder, but guilty of second degree murder. The jury also found true the allegation that he personally used a knife in the commission of the crime. The trial court sentenced defendant to 15 years to life in prison for the murder conviction, and imposed, but stayed, the one-year deadly weapon enhancement. Defendant filed a timely notice of appeal.

DISCUSSION

I

*Instruction on Involuntary Manslaughter*

Defendant contends the trial court erred in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter. We find no error.

A. *Sua sponte instructions and the standard of review*

It is settled that a trial court has a duty to instruct the jury sua sponte on all lesser included offenses supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 162 (*Breverman*); *People v. Steskal* (2021) 11 Cal.5th 332, 345.) Substantial evidence in this context means evidence from which a jury reasonably could conclude the defendant is guilty of the lesser, but not the greater, offense. (*Breverman,*

5

*supra*, at pp. 162, 177; *People v. Vargas* (2020) 9 Cal.5th 793, 827.) Although there is no duty to instruct on a lesser included offense when the evidence supporting such an instruction is weak or based on speculation, instruction is required when the lesser included offense is supported by " ' "evidence that a reasonable jury could find persuasive." ' " (*Steskal, supra*, at p. 345.) This duty arises even when the lesser included offense is inconsistent with the defendant's trial theories or contrary to the defendant's wishes. (*Breverman*, at pp. 162-163.)

This sua sponte instructional requirement " ' "prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other." ' " (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29-30 (*Brothers*).) It protects the jury's " 'truth-ascertainment function' " (*Breverman, supra*, 19 Cal.4th at pp. 199-200) by encouraging a verdict that is neither harsher, nor more lenient, than the evidence merits. (*Brothers, supra*, at p. 30.)

On appeal, we independently review the question of whether the trial court improperly failed to instruct on a lesser included offense, considering the evidence in the light most favorable to the defendant. (*Brothers, supra*, 236 Cal.App.4th at p. 30.)

B.      *Legal principles of murder and manslaughter*

In this case, defendant was charged with a single count of murder. This accusation triggered the trial court's duty to instruct on murder and any lesser included offenses supported by the evidence. (*People v. Campbell* (2015) 233 Cal.App.4th 148, 158-159.) Voluntary and involuntary manslaughter are both lesser included offenses of murder. (*Campbell, supra*, at pp. 159-162.)

Murder is the unlawful killing of a human being committed with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) Malice is express when there is a manifested, deliberate intention to unlawfully take the life of another. (§ 188, subd. (a)(1).)

6

Implied malice has both a physical and mental component.  (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)  The physical component requires an " ' "an act, the natural consequences of which are dangerous to life . . . ." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 143.)  The mental component requires that the act be deliberately performed by a person who " ' "knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " (*Ibid*.)  "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less."  (*Ibid*.)

In general, an unlawful killing committed with malice is murder.  (*People v. Lee* (1999) 20 Cal.4th 47, 59.)  However, even if a defendant acts with an intent to kill or conscious disregard for life, the element of malice may be "negated" by evidence that the defendant acted upon (1) a sudden quarrel; (2) heat of passion; or (3) an unreasonable but good faith belief in the need for self-defense (imperfect self-defense).  (*Ibid*.; *Brothers, supra*, 236 Cal.App.4th at p. 30.)  In these circumstances, a homicide committed with malice, which would normally constitute murder, is reduced to voluntary manslaughter.  (*Brothers*, at p. 30.)

Involuntary manslaughter is an unlawful killing of a human without malice.  (§ 192, subd. (b).)  By statute, commission of the offense requires (1) "an unlawful act, not amounting to a felony"; or (2) "a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."  (§ 192, subd. (b).)  But courts have defined additional, nonstatutory forms of the offense based on the predicate acts of (3) a noninherently dangerous felony accomplished without due caution and circumspection; or (4) an inherently dangerous assaultive felony (not amounting to felony murder).  (*People v. Butler* (2010) 187 Cal.App.4th 998, 1006-1007, citing *People v. Burroughs* (1984) 35 Cal.3d 824, 835-836, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 89; *People v. Bryant* (2013) 56 Cal.4th 959, 966; *Brothers, supra*, 236 Cal.App.4th at pp. 31-33.)  For any form of involuntary

7

manslaughter, the mental state required is criminal negligence. (*Butler, supra*, at pp. 1006-1009; *People v. Skiff* (2021) 59 Cal.App.5th 571, 579; *Brothers*, at pp. 33-34.)

C.    *Analysis*

The question before us is whether there was substantial evidence to support an instruction on involuntary manslaughter as a lesser included offense of murder. If so, the court had a sua sponte duty to give that instruction.

Defendant argues that there was sufficient evidence to warrant the instruction based on his testimony that he jabbed his knife into Poole once, inflicting a single stab wound, because Poole was attacking him with a knife. Defendant also relies on his testimony that he did not engage Poole in a fight, was not seeking revenge, and merely was trying to escape to go to the hospital. Defendant contends his testimony was corroborated by witness testimony that Poole was holding a knife when defendant approached him.

We are not persuaded that an involuntary manslaughter instruction was warranted. Even viewing the record in the light most favorable to defendant, the evidence showed that defendant, after being attacked by Poole with a knife, deliberately armed himself with a blade in anticipation of another possible knife attack. When Poole thereafter attacked defendant, defendant stabbed Poole in the chest, and did so with the express goal of preventing the attack. Undisputed evidence shows that defendant stabbed Poole with a significant amount of force, enough to cause the blade to pierce through Poole's heart, travel past his spine, and exit the back of his chest cavity, leaving a wound five to seven inches deep.

On this record, a reasonable jury could have found defendant guilty of murder, or voluntary manslaughter, or could have found him not guilty of any crime. But no reasonable jury could have concluded that defendant stabbed Poole out of mere criminal negligence. There is no evidence to suggest that defendant's stabbing of Poole was accidental or that defendant did not subjectively appreciate that his conduct—plunging a

8

knife five to seven inches into Poole's chest—was dangerous to human life. (See *Brothers, supra*, 236 Cal.App.4th at pp. 34-35; *People v. Cook* (2006) 39 Cal.4th 566, 596-597; see *People v. Lasko* (2000) 23 Cal.4th 101, 110.)

"[W]hen, as here, the defendant indisputably has deliberately engaged in a type of aggravated assault the natural consequences of which are dangerous to human life, . . . and no material issue is presented as to whether the defendant subjectively appreciated the danger to human life his or her conduct posed, there is no sua sponte duty to instruct on involuntary manslaughter." (*Brothers, supra*, 236 Cal.App.4th at p. 35.) As in *Brothers*, there is no evidence here from which a jury reasonably could conclude that defendant was guilty only of the lesser included offense of involuntary manslaughter. Thus, the trial court did not err in failing to instruct the jury on involuntary manslaughter.

In any event, because the jury found defendant guilty of second degree murder instead of the lesser included offense of voluntary manslaughter, the jury necessarily found that defendant acted with malice. Thus, any error in failing to give an involuntary manslaughter instruction was harmless; there is no reasonable probability that giving such an instruction would have affected the result. (*Breverman, supra*, 19 Cal.4th at pp. 164-165, 174, 176; *People v. Lewis* (2001) 25 Cal.4th 610, 646, superseded by statute on another matter as stated in *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 230, fn. 4 [error in failing to instruct on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions]; *People v. Rogers* (2006) 39 Cal.4th 826, 884 [same].) This is not a case in which the jury was provided an "all or nothing choice." The jury simply concluded that defendant was guilty of the greater, charged offense.

9

II

*Instruction on Contrived Self-Defense (CALCRIM No. 3472)*

Without objection from defense counsel, the trial court instructed the jury with CALCRIM No. 3472, the pattern instruction on contrived self-defense, which provides: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

On appeal, defendant argues the trial court committed prejudicial error by instructing the jury with CALCRIM No. 3472, because it misstated the law under the facts of his case. Defendant contends that because the instruction made no allowance for an intent to use only nondeadly force, it erroneously instructed the jury that defendant forfeited his right to self-defense if he contrived to use *any* force, even if the victim escalated the situation from a nondeadly confrontation into a deadly one. The Attorney General responds that defendant forfeited this claim by failing to object in the trial court and, in any event, the claim lacks merit or was harmless error.

We agree that defendant technically forfeited the issue by failing to object below. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) Nevertheless, we exercise our discretion to reach the merits because the error arguably affected defendant's substantial rights. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.)

Our task is to determine whether the trial court fully and fairly instructed the jury on the general principles of law that were necessary to an understanding of the case. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088; *People v. Hudson, supra*, 38 Cal.4th at p. 1012.) We independently determine whether a jury instruction correctly states the law. (*Ramos, supra*, at p. 1088.) When reviewing a supposedly ambiguous or potentially misleading instruction, we inquire whether there is a reasonable likelihood that the jury misconstrued or misapplied the words of the instruction. (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1491.) A challenged instruction may not be judged in

isolation but must be considered in the context of the instructions as a whole and the entire trial record. (*Ibid.*; *People v. Lopez* (2011) 198 Cal.App.4th 698, 708.) " ' "[W]e assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." ' " (*Ramos*, at p. 1088.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*Ibid.*)

In reviewing the instructions in this case, we begin with the observation that CALCRIM No. 3472 has been found to be a generally correct statement of law. (*People v. Enraca* (2012) 53 Cal.4th 735, 761-762 (*Enraca*); *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334 (*Eulian*).)

In *Enraca, supra*, 53 Cal.4th 735, our Supreme Court reaffirmed the principle that the right of self-defense may not be invoked by a defendant "who, through his own wrongful conduct . . . has created circumstances under which his adversary's attack or pursuit is legally justified." (*Id.* at p. 761.) *Enraca* involved a defendant who, while participating in a gang fight, shot and killed two victims, ostensibly because he believed the victims were about to shoot him. (*Id.* at pp. 742-744.) At trial, the court instructed the jury with CALJIC No. 5.55, the predecessor to CALCRIM No. 3472, which provided: " 'The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.' "[1] (*Enraca*, at p. 761.) On appeal, the defendant claimed there was no factual basis for the challenged instruction. (*Ibid.*) The Supreme Court disagreed, concluding the trial court's instruction was legally correct and supported by the record. (*Id.* at pp. 761-762.) Implicit in the

---

[1] The jury also was instructed under CALJIC No. 5.17, the predecessor to CALCRIM No. 571, that "the principle of imperfect self-defense 'is not available, and malice aforethought is not negated, if the defendant[,] by his unlawful or wrongful conduct[,] created the circumstances which legally justified his adversary's use of force.' " (*Enraca, supra*, 53 Cal.4th at p. 761.)

11

court's conclusion is that the jury could have found the defendant, through his unlawful conduct in assaulting the victims with a gun, created the circumstances which legally justified the victim's use of deadly force. (*Ibid*.)

While *Enraca* involved the CALJIC predecessor to the instruction at issue here, the language of the two instructions is "materially the same." (*Eulian, supra*, 247 Cal.App.4th at p. 1333.) Thus, in *Eulian*, the Second Appellate District, Division Five, cited *Enraca* for the proposition that CALCRIM No. 3472 is "generally a correct statement of law, which might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*Eulian*, at p. 1334; accord, *People v. Ramirez* (2015) 233 Cal.App.4th 940, 947 (*Ramirez*) ["CALCRIM No. 3472 states a correct rule of law in appropriate circumstances"].) We agree.

Relying on *Ramirez, supra*, 233 Cal.App.4th 940, defendant argues that CALCRIM No. 3472 misstated the law by instructing the jury, categorically, that a person who provokes a fight or quarrel, with the intent to create an excuse to use force, has no right of self-defense. He contends the instruction failed to inform the jury that a person who contrives to provoke a nondeadly quarrel may regain the right to self-defense if the adversary escalated the situation by using deadly force. Thus, he argues the instruction erroneously prevented the jury from considering his primary defense (self-defense) because it established that he was not entitled to use self-defense if the jury believed he intended to provoke a fight as an excuse to use any force, even nondeadly force. We conclude that defendant's reliance on *Ramirez* is misplaced. The case is distinguishable on its facts and its holding is not applicable here.

In *Ramirez*, a divided court concluded that while CALCRIM No. 3472 states a correct rule of law in "appropriate circumstances," it misstated the law under the facts of that case. (*Ramirez, supra*, 233 Cal.App.4th at pp. 945, 947-948.) The defendants in *Ramirez* were gang members who provoked a fistfight with a rival gang. (*Id*. at pp. 944-

12

945.) At trial, one of the defendants testified that he saw a rival gang member raise an object that looked like a gun, so the defendant pulled out his gun and fatally shot him. (*Ibid*.) The trial court instructed the jury with CALCRIM No. 3472, and the prosecutor highlighted the instruction in closing, arguing that it precluded any claim of self-defense, even if the defendants only intended to provoke a fistfight. (*Id*. at pp. 945-947.) Relying on CALCRIM No. 3471, defense counsel argued in closing that an initial aggressor's or mutual combatant's right of self-defense may be revived if an opponent in a nondeadly confrontation suddenly resorts to deadly force. (*Id*. at pp. 946-948.) However, in rebuttal, the prosecution insisted that CALCRIM No. 3472 precluded an initial aggressor from regaining the right to use deadly force in self-defense. (*Ibid*.) In reaching its guilty verdict, the jury circled CALCRIM No. 3472. (*Id*. at p. 947.)

On these unique facts, the Ramirez *majority* concluded that CALCRIM No. 3472 did not accurately state the governing law because it erroneously informed the jury that contriving to use *any* amount of force forfeits the right of self-defense, even if the defendant contrived to use only nondeadly force and the adversary responded with deadly force. (*Ramirez, supra*, 233 Cal.App.4th at pp. 947, 949-950, 952-953.) In effect, the majority held, the instructions and the prosecution's arguments misstated the law because they made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence. (*Id*. at pp. 945, 953.)

In a vigorous dissent, Justice Fybel argued that the jury was properly instructed. (*Ramirez, supra*, 233 Cal.App.4th at p. 954 (dis. opn. of Fybel, J.)) He argued that, by its terms, CALCRIM No. 3472 only "applies to a subset of individuals who not only instigate a fight, but do so with the specific intent that they contrive the necessity for their acting thereafter in 'self-defense,' and thus justify their further violent actions." (*Id*. at p. 954 (dis. opn. of Fybel, J.).) "Hence, if the initial aggressor simply provokes a fight using nondeadly force—without an intent to create a larger conflict for the purpose of covering for him or her to engage in further violence in the name of self-defense—he or

13

she is not precluded from claiming self-defense or imperfect self-defense in responding to the adversary's response of deadly force." (*Id.* at p. 955 (dis. opn. of Fybel, J.).)

The Attorney General argues that the dissent in *Ramirez* is correct and that the majority opinion should not be followed. We conclude, however, that it is unnecessary for us to decide whether the majority or dissent was correct because, even under the *Ramirez* majority view, this was not the "rare case" in which a modification to CALCRIM No. 3472 was required. (See *Eulian, supra*, 247 Cal.App.4th at p. 1334.)

First, there was no substantial evidence to support a theory that defendant had a right to defend himself with deadly force because, despite contriving to provoke a nondeadly confrontation, Poole unexpectedly responded with deadly force. Under the prosecution's version of the evidence, it was defendant, not Poole, who created the deadly scenario, first, by provoking a violent group beating of Poole, and then later, by attacking Poole with a knife. In contrast, under the defense version of the evidence, it was Poole who attacked defendant with deadly force after defendant attempted to break up a fight. Under no theory of the evidence did defendant provoke a nondeadly confrontation only to have Poole escalate it to a deadly one.

Second, the other jury instructions in this case—in particular, CALCRIM No. 3471—accurately informed the jury that "if the defendant used only non-deadly force and the proponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force . . . ." And, unlike *Ramirez*, the prosecutor here did not repeatedly argue that CALCRIM No. 3472 "obliterated all forms of self-defense . . . if the defendant contrived to use any force." (*Ramirez, supra*, 233 Cal.App.4th at p. 950.) Rather, the prosecutor relied on the evidence admitted at trial to demonstrate that defendant did not act in self-defense. Thus, we conclude the trial court's instructions as a whole adequately communicated the revived right of self-defense if an opponent in a nondeadly

14

confrontation suddenly resorts to deadly force. There is no reasonable likelihood that the jury misconstrued or misapplied the court's instructions to reach a contrary conclusion.

## III

### *Ability to Pay Hearing*

At sentencing, the trial court imposed the following fines and fees: a $10,000 restitution fine (§ 1202.4, subd. (b)), a suspended $10,000 parole revocation restitution fine (§ 1202.45), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 court facilities assessment. (Gov. Code, § 70373.) Defendant objected to the fines and fees based on inability to pay. Although defense counsel represented that defendant had "no means of support," defendant did not present any evidence to support his asserted inability to pay. The trial court overruled defendant's objection.

On appeal, citing *Dueñas, supra*, 30 Cal.App.5th 1157, defendant argues that imposition of the fines and fees without a determination of his ability to pay violated due process. Defendant contends that remand is required for an ability to pay hearing.[2] The Attorney General responds that *Dueñas* was wrongly decided and that due process does not require any determination of a defendant's ability to pay before imposing the punitive restitution fines. With respect to the nonpunitive assessments, the Attorney General concedes *Dueñas* applies, but argues that any error was harmless because there is nothing in the record to suggest defendant would be unable to pay the relatively minor fees. Because we believe *Dueñas* was wrongly decided, not just in regard to the restitution fines but also the nonpunitive assessments, we decline the Attorney General's concession.

---

**2**    To the extent defendant intended to raise a claim based on a violation of the Eighth Amendment right against excessive fines, we deem the argument forfeited due to his failure to raise it in a proper heading and support it with citation to relevant authority. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4.)

In *Dueñas*, the Second Appellate District, Division Seven, held that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before imposing court assessments under section 1465.8 and Government Code section 70373. (*Dueñas, supra*, 30 Cal.App.5th at p. 1164.) The court also held that "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.)

Since *Dueñas* was decided, a split in authority has developed among the appellate courts as to whether it was correctly decided. (See *People v. Taylor* (2019) 43 Cal.App.5th 390, 398 [discussing split]; *People v. Belloso* (2019) 42 Cal.App.5th 647, 649-650, review granted Mar. 11, 2020, S259755 [same].) Our Supreme Court is now poised to resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, which followed *Dueñas* in part. (*Kopp, supra*, at pp. 94-97, rev.gr.)

In the meantime, we join those courts that have found *Dueñas* to be wrongly decided and hold that principles of due process do not require an ability to pay hearing before such fines and fees are imposed. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279-282; *People v. Hicks* (2019) 40 Cal.App.5th 320, 326-329, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067-1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928; *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1056-1057; *People v. Adams* (2020) 44 Cal.App.5th 828, 831-832; *People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 860-861; *People v. Cota* (2020) 45 Cal.App.5th 786, 793-795.) Thus, we reject defendant's claim that due process entitles him to an ability to pay hearing.

IV

*Ineffective Assistance of Counsel*

Defendant's final claim is that his counsel rendered ineffective assistance by failing to provide mitigating youth-related evidence at sentencing. We deny the contention, without prejudice.

A.    *Background*

Defendant was convicted of an offense that was committed when he was 25 years of age or younger and for which the sentence is a life term of less than 25 years to life. He therefore is eligible for release on parole at a youth offender parole hearing during his 20th year of incarceration. (§ 3051, subd. (b)(2).) At such hearing, in reviewing defendant's suitability for parole, the Board of Parole Hearings shall be required to give "great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c); *In re Brownlee* (2020) 50 Cal.App.5th 720, 725.)

In *People v. Franklin* (2016) 63 Cal.4th 261, the California Supreme Court held that defendants who qualify for a youth offender parole hearing must be given an opportunity to create a record of mitigating youth-related evidence relevant to such a hearing. (*Id*. at pp. 283-284.) In *Franklin*, because the defendant was sentenced before the enactment of section 3051 (*Franklin, supra*, at pp. 269, 284), the case was remanded to the trial court for the limited purpose of determining whether the defendant "was afforded an adequate opportunity" to make a record of information relevant to his eventual youth offender parole hearing and, if not, to hold a proceeding for that purpose. (*Id*. at pp. 286-287.)

In *In re Cook* (2019) 7 Cal.5th 439 (*Cook*), the Supreme Court clarified that an offender entitled to a youth offender parole hearing may seek a *Franklin* proceeding even if the offender's sentence is otherwise final. (*Cook, supra*, at p. 451.) The court

17

explained that "[n]othing about the remand[] in *Franklin* . . . was dependent on the nonfinal status of the juvenile offender's conviction. On the contrary, '[t]he statutory text makes clear that the Legislature intended youth offender parole hearings to apply retrospectively, that is, to *all eligible youth offenders regardless of the date of conviction.*' " (*Cook*, at p. 450, original italics.) The court also explained that in cases with final judgments, the proper mechanism to request a *Franklin* proceeding is by filing a motion under section 1203.01. (*Cook*, at pp. 446-447, 452, 458-459.)

B.    *Analysis*

Nothing in the record before us indicates that defendant lacked an adequate opportunity at sentencing to create a record of mitigating evidence tied to his youth. "Rather, it appears that he merely failed—whether by choice or by inadvertence—to exercise it." (*People v. Medrano* (2019) 40 Cal.App.5th 961, 967.) Thus, defendant forfeited his right to create a record of mitigating, youth-related evidence at sentencing. (*Id*. at p. 968, fn. 9.) Anticipating the forfeiture problem, defendant asserts ineffective assistance of counsel.

To establish ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that the deficient performance was prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 697-698]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) California courts have characterized a defendant's burden as " 'difficult to carry on direct appeal,' " as the defendant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) Where, as here, the record sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was " ' "no conceivable tactical purpose" ' for counsel's act or omission." (*People v. Lewis, supra*, 25 Cal.4th at p. 675.)

On this record, we cannot conclude defense counsel's performance necessarily fell below a standard of reasonable competence. There is a conceivable satisfactory explanation for counsel's failure to present youth-related evidence: counsel may have concluded that such evidence would not be helpful or that it would be damaging to the defendant. As our Supreme Court observed in *Cook*, "[d]elving into the past is not always beneficial to a defendant." (*Cook, supra*, 7 Cal.5th at p. 459.)

Additionally, defendant cannot show prejudice. Defendant admits that he has filed a postjudgment motion in the trial court requesting a *Franklin* proceeding under section 1203.01, but there is no indication from either party whether the motion has been heard or decided. Thus, defendant still has remedies available in the trial court that would negate any possible prejudice. (*People v. Medrano, supra*, 40 Cal.App.5th at p. 968 [declining remand for *Franklin* proceeding because defendant could file motion under section 1203.01].)

For these reasons, we shall deny defendant's ineffective assistance claim, but without prejudice to defendant's right to file a new appeal (or a petition for writ of habeas corpus) should his section 1203.01 motion be denied by the trial court.

## DISPOSITION

The judgment is affirmed. The requested remand for a *Franklin* proceeding is denied without prejudice to defendant's right to file a new appeal (or a petition for writ of

habeas corpus) should his pending motion under section 1203.01 be denied by the trial court.

                                                              KRAUSE          , J.

I concur:

      RENNER         , J.

I concur; as to part III, I concur in the result:

      MAURO        , Acting P. J.

20